Oakeson v. TBM Consulting Group, Inc., 2009 NCBC 23.

STATE OF NORTH CAROLINA   IN THE GENERAL COURT OF JUSTICE
               SUPERIOR COURT DIVISION
COUNTY OF DURHAM        08 CVS 3884

| | | |
|---|---|---|
| MARK W. OAKESON, | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | **ORDER ON MOTION TO DISMISS** |
| | ) | |
| TBM CONSULTING GROUP, INC., ANAND | ) | |
| SHARMA, GARY HOURSELT, WILLIAM | ) | |
| SCHWARTZ and DAN SULLIVAN, | ) | |
| Defendants | ) | |

   THIS CAUSE, designated a mandatory complex business case by Order of the Chief Justice of the Supreme Court of North Carolina, pursuant to N.C. Gen. Stat. § 7A-45.4, and assigned to the undersigned Special Superior Court Judge for Complex Business Cases by Order of the Chief Special Superior Court Judge for Complex Business Cases, is before the court for determination of the Defendants' Motion to Dismiss ("Motion") all but the First Cause of Action alleged in Plaintiff's Complaint, pursuant to the provisions of Rule 12(b)(6), North Carolina Rules of Civil Procedure ("Rule(s)"); and

   THE COURT, having considered the Defendants' Motion, the arguments and briefs in support of and in opposition to the Motion, and appropriate matters of record, CONCLUDES that the Motion should be DENIED, for the reasons stated herein.

I.

PROCEDURAL BACKGROUND

   [1]  This civil action was filed by Plaintiff on July 3, 2008. As it currently is postured, the Complaint alleges five Causes of Action ("Claim(s)"): First Claim – Breach

of Contract; Second Claim – Breach of Implied Covenant of Good Faith and Fair Dealing; Third Claim – Breach of Fiduciary Duty; Fourth Claim – Civil Conspiracy; and Fifth Claim – Punitive Damages.[1]

[2]     Defendants seek dismissal of Claims Two through Five as a matter of law.

II.

FACTS

Among other things, the Complaint alleges that:

[3]     Plaintiff Mark W. Oakeson ("Oakeson") is a citizen and resident of Durham County, North Carolina.  At times material, he was an officer, shareholder and member of the Board of Directors ("Board") of Defendant TBM Consulting Group, Inc. ("TBM").

[4]     Defendant TBM is a Delaware corporation, with its principal place of business in Durham County, North Carolina.

[5]     Defendant Anand Sharma ("Sharma") is and at all times relevant to this action was the President, majority shareholder and a Board member of TBM, and was acting as an agent of and with full authority of TBM.

[6]     Defendant Gary Hourselt ("Hourselt") is and at all times relevant to this action was an officer, shareholder and Board member of TBM, and was acting as an agent of and with the full authority of TBM.

[7]     Defendant William Schwartz ("Schwartz") is and at all times relevant to this action was an officer, shareholder and Board member of TBM, and was acting as an agent of and with the full authority of TBM.

---

[1] The Complaint initially contained a Sixth Claim – Unfair and Deceptive Trade Practices.  However, by notice dated September 24, 2008, Plaintiff voluntarily dismissed his Sixth Claim pursuant to Rule 41(a).

[8]     Defendant Dan Sullivan ("Sullivan") is and at all times relevant to this action was an officer, shareholder and Board member of TBM, and was acting as an agent of and with the full authority of TBM.

[9]     In or about December 1992, Plaintiff and TBM entered into a written shareholder agreement ("Shareholder Agreement").[2]  Under the terms of the Shareholder Agreement, and in consideration therefore, Plaintiff became a twenty-two percent (22%) shareholder in TBM; and was employed and compensated as Vice-President and an employee of TBM.

[10]    Plaintiff operated under the Shareholder Agreement until January 14, 2004, when the shareholders of TBM entered into a Waiver and Modification of Shareholders Agreement ("Modified Shareholder Agreement")[3] (the Shareholder Agreement and the Modified Shareholder Agreement collectively are the "Shareholder Agreements"), in order to allow certain shares of TBM to be transferred to a TBM Employee Stock Ownership Plan ("ESOP").  Thereafter, while Plaintiff was still a shareholder of TBM under the terms of the Modified Shareholder Agreement, the Plaintiff and TBM entered into an Employment Agreement ("Employment Agreement").[4]

[11]    As part of the consideration for the Employment Agreement, the Plaintiff and TBM mutually agreed in writing as follows:

(a)     Plaintiff's term of employment was to be for a period of five (5) years beginning on January 1, 2004, and ending on January 1, 2009.

(b)     Plaintiff was to continue his role as the Vice-President of TBM.

---

[2] Compl., Ex. A.
[3] *Id.*, Ex. B.
[4] *Id.*, Ex. C.

(c)     Plaintiff was to receive a guaranteed base salary of $330,000 per year through January 1, 2009, plus bonus compensation as enumerated more specifically in the Employment Agreement.

(d)     Plaintiff was to receive medical benefits through January 1, 2009, plus annual paid vacation, country club membership and 401K matching contributions.

(e)     The Employment Agreement could be terminated only by TBM "for cause."  Specifically, paragraph 12 provides:

12. <u>Termination by Company</u>.   Other than as described in paragraph 5 or paragraph 11 hereof, this Agreement may be terminated by the company only for cause at any time by giving thirty days written notice of termination to the Employee. "Cause" for termination of the employee by the company shall be limited to:

a. refusal to carry out the legitimate, proper and material duties assigned to him by the board of directors of the Company, which refusal shall have continued for a period of at least thirty (30) days, or breach of any one or more of the material provisions of this Agreement, which failure, refusal or breach shall have continued for a period of at least thirty (30) days after such notice from the Company describing such failure, refusal or breach in reasonable detail;

b. conviction of, or pleading guilty or nolo contendere to any felony;

c. final judgment by any court of competent jurisdiction that the Employee has committed an act or omission of willful malfeasance or any act of fraud, embezzlement, misappropriation of funds, breach of fiduciary duty or other act of dishonesty against the Company or any affiliate, any customer or supplier of the Company or any affiliate, or any shareholder or employee of the Company or any affiliate.

[12]     Thereafter, Plaintiff continued as a thirteen and one-half percent (13.5%) shareholder of TBM, a Board member of TBM and as Vice-President of Global Consulting for TBM.

[13]     Throughout 2004, Sharma consistently requested that Plaintiff restructure the Shareholder Agreements with TBM, which Plaintiff refused to do.

[14]     The domestic consulting work by TBM was split into two teams, US East and US West.  Plaintiff was placed in charge of the US East team with five consulting teams directly under his management and supervision, and Sullivan was placed in charge of the US West team.  Plaintiff alleges that his global consulting obligations, field contact and opportunities were drastically reduced as a result of this assignment.

[15]     In mid-2004, Sharma shifted two US East consulting teams under Plaintiff to the US West team.

[16]     Shortly thereafter, Sharma indicated that the Plaintiff would no longer be responsible for managing any consulting teams and that Plaintiff's title was being changed to "Vice-President of Client Development," a new position that had not previously existed.

[17]     Throughout the remainder of 2004 and 2005, Sharma continued to request that the Plaintiff restructure his Employment Agreement and Shareholder Agreements with TBM, which Plaintiff continued to refuse to do.

[18]     In June 2005, Sharma requested that Plaintiff meet with him on July 5, 2005, in Durham, North Carolina.  At the July 5, 2005 meeting, Sharma, for reasons unknown to the Plaintiff and without justification, told Plaintiff to resign as a member of the TBM Board and as an officer and employee of TBM by July 31, 2005.

[19]    At the July 5, 2005 meeting, Sharma alleged that the Plaintiff's production had fallen and indicated that Sharma, Hourselt, Schwartz, and Sullivan (the "Defendant Shareholders") had agreed that they did not want Plaintiff to be there any longer and wanted him to resign by the end of July.  During the same meeting, Sharma indicated that he had the support of the Defendant Shareholders to remove Plaintiff as a shareholder under the terms of the Shareholder Agreements, and stated that Plaintiff should not resist this effort, and "if you do we will deal with this situation strongly as we are resolute in our decision to remove you."[5]  In response, Plaintiff stated that he did not wish to leave TBM and that he intended to remain with TBM until he retired.

[20]    Faced with Sharma's demand, and as an alternative to being forced to resign, Plaintiff inquired about the possibility of a different employment arrangement that would allow him to remain with TBM.  Plaintiff's inquiry was rebuffed by Sharma.

[21]    Plaintiff refused to resign from TBM and demanded a meeting of all Shareholders to discuss the demand for his resignation and to demonstrate his productivity to those who wanted him to leave TBM.  Sharma agreed to inform all shareholders and members of the Board, and told Plaintiff they would meet again on or about July 8, 2005.  Sharma failed to give the required notice to all shareholders and members of the Board, and several shareholders were unaware of the meeting and/or the circumstances around it.

[22]    During the meeting on July 8, 2005, Plaintiff met with Sharma and the Defendant Shareholders.  Sharma again renewed his demand that Plaintiff resign as a Board member, officer and employee of TBM by July 31, 2005.  Plaintiff again inquired if there were any alternatives that would allow him to remain with TBM, and was again

---

[5] *Id.* at ¶ 34.

told no. During this meeting, Plaintiff asked if the reason for asking him to resign was his level of compensation. Schwartz responded that Plaintiff's level of compensation was too high, but that compensation was only "half of it, the other half is the direction of the company."[6]

[23]    Sharma and the Defendant Shareholders agreed among themselves to force Plaintiff to leave TBM for the purpose of making him divest his TBM and ESOP stock as required by the Shareholder Agreements.

[24]    Plaintiff again refused to resign as a Board member, officer or employee and requested another meeting with all of the Shareholders upon his return from an upcoming business trip.

[25]    Plaintiff traveled the week of July 11-15 to Naples, Italy, to visit a consulting client of TBM, where he performed his work without incident. On or about July 18, 2005, Sharma asked to meet with the Plaintiff and Hourselt at the TBM office in Durham prior to a Board meeting scheduled for later that same afternoon.

[26]    During the July 18, 2005 meeting with Sharma and Hourselt, Plaintiff presented spreadsheets and other factual information demonstrating his consistent productivity, showing his contribution to TBM. During the meeting, Sharma asked Plaintiff if Plaintiff had reconsidered his resignation. Sharma also told Plaintiff that the Defendant Shareholders had discussed the situation and had decided that they would not accept Plaintiff's remaining as an employee, and that the only option was for Plaintiff to resign as a director, officer and employee of TBM. Sharma again told Plaintiff that Sharma and the Defendant Shareholders had the votes to get rid of Plaintiff, so Plaintiff might as well resign. Sharma told Plaintiff that "he shouldn't bother to come to the

---

[6] *Id.* at ¶ 45.

Board meeting"[7] that afternoon.  Plaintiff did not attend the Board meeting on July 18, 2005.

[27]    Feeling he had no other option, by e-mail on July 18, 2005, Plaintiff tendered his resignation as a TBM Board member.  At this time, Plaintiff was still an officer and employee at TBM.

[28]    Plaintiff returned to work at the Avio facility in Italy.  While at the Avio plant on or about July 22, 2005, an Avio representative asked Plaintiff for information which necessitated Plaintiff accessing his employee account on TBM's computer system.  Finding that his user name and password no longer worked, he called TBM computer IT representative Michael Hunt ("Hunt").

[29]    Hunt indicated that he had been given a directive by Sharma to "not let [Plaintiff] into the computer system."[8]  Plaintiff was blocked from the necessary and customary tools to complete his job as an employee of TBM.

[30]    Upon returning to the United States on July 27, 2005, Plaintiff received an e-mail and attachment from Sharma.  The attachment, dated July 26, 2005, is a letter stating, in part, "[y]ou have tendered your resignation from the [Board] and we have accepted that resignation.  We also ask that you tender your resignation as an officer and employee of TBM effective as of the close of business, July 31, 2005."[9]  Plaintiff did not accept or acknowledge the July 26, 2005 letter.

[31]    On or about July 28, 2005, Plaintiff received a voicemail message from Sharma, which again demanded that Plaintiff resign as a TBM officer and employee.

---

[7] *Id.* at ¶ 54(d).
[8] *Id.* at ¶ 62.
[9] Id. at ¶ 69 (citing to Compl., Ex. D.)

[32]    On Friday July 29, 2005, Plaintiff sent an e-mail to Sharma which stated, "Effective Friday the 29th I resign as an officer and employee." [10]

III.

THE DEFENDANTS' MOTION

[33]    Dismissal of an action pursuant to Rule 12(b)(6) is appropriate when the complaint fails to state claim upon which relief can be granted.  Rule 12(b)(6).

[34]    When deciding a Rule 12(b)(6) motion, the well-pleaded allegations of the complaint are taken as true and admitted, but conclusions of law or unwarranted deductions of facts are not admitted.  *Sutton v. Duke*, 277 N.C. 94, 98 (1970).

[35]    A complaint fails to state a claim upon which relief can be granted when either (a) the complaint on its face reveals that no law supports the plaintiff's claim, (b) the complaint on its face reveals the absence of facts sufficient to make a good claim or (c) some fact disclosed in the complaint necessarily defeats the plaintiff's claim. *Jackson v. Bumgardner*, 318 N.C. 172, 175 (1986).  However, a complaint should not be dismissed for failure to state a claim upon which relief can be granted unless it (a) does not give sufficient notice to the defendant of the nature and basis of the plaintiff's claim, or (b) appears beyond a reasonable doubt that the plaintiff could not prove any set of facts in support of his claim that would entitle him to relief.  *Sutton v. Duke,* 277 N.C. at 108.

[36]    When determining whether a complaint states a claim upon which relief can be granted in the context of a Rule 12(b)(6) motion, the court may consider documents that are the subject of the action and specifically referenced in the complaint.  *See Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 60–61 (2001) ("This

---

[10] Compl., at ¶ 73.

Court has further held that when ruling on a Rule 12(b)(6) motion, a court may properly consider documents which are the subject of a plaintiff's complaint and to which the complaint specifically refers even though they are presented by the defendant."); *Robertson v. Boyd*, 88 N.C. App. 437, 441 (1988) ("[b]ecause these documents were the subjects of some of plaintiffs' claims and plaintiffs specifically referred to the documents in their complaint, they could properly be considered by the trial court in ruling on a motion under Rule 12(b)(6)"). Consequently, the documents attached as exhibits or otherwise referred to in the Complaint in this action are deemed to be before the court for Rule 12(b)(6) purposes.

IV.

DISCUSSION

A.

Plaintiff's Second Claim – Breach of Covenant of Good Faith and Fair Dealing

[37]    Defendants contend that in substance, Plaintiff's Second Claim is simply a way of restating, through the use of tort language, the breach of contract action stated in Plaintiff's First Claim.  In support of their argument, Defendants rely primarily upon the seminal case of *N.C. State Ports Authority v. Lloyd A. Fry Roofing Co.*, 294 N.C. 73 (1978), which held that a tort action generally is not supportable as a separate claim arising from an alleged breach of contract, even if the breach is alleged to be either negligent or intentional.  To support a separate tort claim in the context of a breach of contract action, the plaintiff must allege and prove a claim that is separate and distinct from the contended contract breach.  *Id.*

[38]     In response, Plaintiff argues that in appropriate circumstances, North Carolina recognizes a cause of action for breach of the duty of good faith and fair dealing.  He cites various cases supporting his contention, including *Richardson v. Bank of America, N.A.*, 182 N.C. App. 531 (2007); *Eastway Wrecker Service, Inc. v. City of Charlotte*, 165 N.C. App. 639 (2004) and *Gant v. NCNB*, 94 N.C. App. 198 (1989).

[39]     Plaintiff contends that the totality of alleged circumstances surrounding Plaintiff's leaving his employment with TBM, as alleged in the Complaint, dictates that his Second Claim is entitled to survive Rule 12(b)(6) scrutiny.  Plaintiff argues that his position is supported by the standard articulated by Chief Justice Sharp in *Sutton v. Duke,* in which the North Carolina Supreme Court adopted and quoted with approval the following language from *Conley v. Gibson*, 355 U.S. 41 (1957):

> [W]e follow . . . the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitled him to relief.

*Id.* at 102.

In *Sutton v. Duke*, the Court further held that Rule 12(b)(6) "generally precludes dismissal except in those instances where the face of the complaint discloses some insurmountable bar to recovery," quoting from *American Dairy Queen Corp. v. Augustyn*, 278 F. Supp. 717 (1967).  *Id.*

Further, the *Sutton* Court quotes *Shull v. Pilot Life Insurance Co.*, 313 F. 2d 445 (5th Cir. 1963), recognizing that survival of a complaint at the Rule 12(b)(6) stage does not

> necessarily mean that there must be a full-blown trial. Utilizing the "facility of pretrial discovery, the real facts can be ascertained and by motion for summary judgment (or other

suitable device) the trial court can determine whether as a matter of law there is any right of recovery on those facts."

*Id. at 104.*

[40]     In the instant action, the allegations go beyond a pure and simple contract claim. Rather, they raise implications of the respective fiduciary duties, if any, between shareholders in a closely-held corporate setting, and of possible civil conspiracy. The allegations give sufficient notice of the nature and basis of this Second Claim. Further, upon examination of the totality of facts alleged in Plaintiffs' Complaint, the court is unable to conclude from the face of the Complaint that as a matter of law there is no set of facts that might be proven that would support this Claim.

[41]     Accordingly, in his Second Claim, the Plaintiff has stated a claim upon which relief can be granted.

B.

Plaintiff's Third Claim – Breach of Fiduciary Duty

[42]     By way of this Claim, Plaintiff alleges that the Defendant Shareholders, for themselves and as agents of TBM, failed to discharge their fiduciary duty to Plaintiff in his position as a minority shareholder of TBM. Defendants contend, in substance, that since Plaintiffs' Complaint does not allege that the Defendants' conduct harmed TBM, his Claim does not pass muster under a Rule 12(b)(6) standard.

[43]     Plaintiff contends that the fiduciary duty owed by majority shareholders to a minority shareholder is clear, and that a violation of that duty is actionable when a majority of shareholders, in the absence of good faith, care and diligence, use their majority position to take advantage of a minority shareholder to his injury. Among other

cases, Plaintiff relies upon *Farndale Co. v. Gibellini*, 176 N.C. App. 60 (2006). Plaintiff contends that Defendants' statement of the duty is too narrow.

[44] The court is forced to agree with Plaintiff. Our courts long have recognized that a controlling corporate shareholder owes a fiduciary duty to minority shareholders not to misuse his management power to promote his personal interests.

In *Freese v. Smith*, 110 N. C. App. 28 (1993), the Court of Appeals held:

> As a general rule, shareholders do not owe a fiduciary duty to each other or to the corporation . . . . However, this rule is not without exception. In North Carolina, it is well established that a controlling shareholder owes a fiduciary duty to minority shareholders. . . . Once a minority shareholder challenges the actions of the majority, the burden shifts to the majority to establish the fairness and good faith of [the majority's] actions.

*Id.* at 37.

Earlier, in *Gaines v. Long Manufacturing Co.*, 234 N.C. 331 (1951), the Supreme Court, quoting from Am. Jur., Corporations, §§ 422-23, held:

> [T]he holders of the majority of the stock of a corporation have the power, by the election of directors and by the vote of their stock, to do everything that the corporation can do. Their power to . . . direct the action of the corporation places them in its shoes and constitutes them the actual, if not the technical, trustees for the holders of the minority of the stock. . . . . The devolution of unlimited power imposes on holders of the majority of the stock a correlative duty, the duty of a fiduciary or agent, to the holders of the minority of the stock, who can act only through them – the duty to exercise good faith, care, and diligence to make the property of the corporation produce the largest possible amount, to protect the interests of the holders of the minority of the stock, and to secure and pay over to them their just proportion of the income and of the proceeds of the corporate property. The controlling majority of the stock holders of a corporation, while not trustees in a technical sense, have a real duty to protect the interests of the minority in the management of the corporation, especially where they undertake to run the

corporation without giving the minority a voice therein. This is so because the holders of a majority of the stock have a community of interests with the minority holders in the same property and because the latter can act and contract in relation to the corporate property only through the former. It is the fact of control of the common property held and exercised, and not the particular means by which or manner in which the control is exercised, that creates the fiduciary obligation on the part of the majority stock holders in a corporation for the minority holders. Actual fraud or mismanagement, therefore, is not essential to the application of the rule.

*Id.* at 344-45.

The Court in *Gaines* further observed, quoting from *White v. Kincaid*, 149 N.C. 415 (1908), that if it was established that controlling shareholders took action that was

not taken for the benefit of the corporation, or in furtherance of its interest, but for the mere purpose of unjustly oppressing the minority of the stockholders or any of them, and causing a destruction or sacrifice of their pecuniary interests or holders . . . such action could well become the subject of judicial scrutiny and control.

*Id.* at 345.

[45]    It ultimately may turn out that any motives and/or actions taken by Defendants with regard to Plaintiff's position with TBM were supported by one or more legitimate business reasons and constituted the exercise of good corporate judgment. If so, this Third Claim will fail. However, in a Rule 12(b)(6) context, the court concludes that the allegations give sufficient notice of the nature and basis of this Third Claim. Further, the court is unable to conclude from the face of the Complaint that as a matter of law there is no set of facts that might be proven that would support this Claim.

[46]    Accordingly, in his Third Claim, the Plaintiff has stated a claim upon which relief can be granted.

C.

Plaintiff's Fourth Claim – Civil Conspiracy

[47]    Defendants contend that North Carolina does not recognize a cause of action for civil conspiracy.  They rely upon *Toomer v. Garrett*, 155 N.C. 462 (2002); *Dove v. Harvey*, 168 N.C. App. 687 (2005) and *Reid v. Holden*, 242 N.C. 408 (1955).

[48]    As reflected by the holdings in the above reported decisions, Defendants are correct in their assertion that North Carolina does not recognize an independent cause of action for civil conspiracy.  However, the reported cases also make it clear that where there exists a separate but underlying claim for unlawful conduct, a plaintiff also may state a claim for civil conspiracy by alleging that two or more persons came together in agreement to carry out the unlawful conduct complained of in the separate cause of action, and that injury to the plaintiff proximately resulted from the agreement.

In *Reid*, the Supreme Court stated:

> The gist of the civil action for conspiracy is the act or acts committed in pursuance thereof – the damage – not the conspiracy or the combination.  The combination may be of no consequence except as bearing upon rules of evidence or the persons liable. . . . To create civil liability for conspiracy there must have been an overt act committed by one or more of the conspirators pursuant to the scheme and in furtherance of the objective.

> *Id.* at 415.

[49]    The Complaint in this action alleges that the Defendant Shareholders agreed on a combined course of various actions designed to force Plaintiff out of TBM in all his corporate capacities, one of those actions resulting in breach of Plaintiff's Employment Agreement.  It alleges that Plaintiff was injured as a result of those actions. The court concludes that the allegations give sufficient notice of the nature and basis of

this Fourth Claim.  Further, the court is unable to conclude from the face of the Complaint that as a matter of law there is no set of facts that might be proven that would support this Claim.

[50]    Accordingly, in his Fourth Claim, the Plaintiff has stated a claim upon which relief can be granted.

D.

Plaintiff's Fifth Claim – Punitive Damages

[51]    Defendants contend that Plaintiff's Claims fundamentally arise out of contract, and that Plaintiff's Fifth Claim is precluded by the provisions of N.C. Gen. Stat. § 1D-15(d), which provides that "punitive damages shall not be awarded against a person solely for breach of contract."  They inferentially concede that punitive damages may stand when requisite aggravating factors properly are pled, and they argue the Complaint does not contain sufficient allegations to support such a Claim.

[52]     It is clear that North Carolina is cautious in its approach to a punitive damages claim arising from breach of contract.  Notwithstanding this caution, when a breach of contract claim reflects potential fraud or deceit, or other aggravated or malicious behavior, a claim for punitive damages may lie.  *Rhyne v. K-Mart Corp.*, 149 N.C. App. 672 (2002); S*mith v. Nationwide Mut. Fire Ins. Co.*, 96 N.C. App. 295 (1989); and *Club Car, Inc. v. Dow Chemical Co.*, 2007 NCBC 10 ¶ 31 (N.C. Super. May 3, 2007).

[53]    Further, the North Carolina courts will recognize a claim for punitive damages arising from a breach of fiduciary duty when it is coupled with the requisite

aggravating factors. *Vanwyk Textile Systems, B.V. v. Zimmer Machinery America, Inc.*, 994 S. Supp. 350 (W.D.N.C. 1997).[11]

[54]    The Fifth Claim alleges that the Defendants' actions constituted "malice," were "willful and wanton" and were based upon a "sense of personal ill will" toward Plaintiff.[12]  When those allegations are viewed in the light of Plaintiff's First Claim and Third Claim, the court concludes that the allegations give sufficient notice of the nature and basis of this Fifth Claim.  Further, the court is unable to conclude from the face of the Complaint that as a matter of law there is no set of facts that might be proven that would support this Claim.

[55]    Accordingly, in his Fifth Claim, the Plaintiff has stated a claim upon which relief can be granted.

V.

CONCLUSIONS

[56]    The allegations of Plaintiff's Second, Third, Fourth and Fifth Claims are sufficient to give Defendants notice of the nature and basis of each of the Claims.

[57]    The court is unable to conclude as a matter of law that on the face of the Complaint there is no set of facts that might be proven that would support each of the Claims.

[58]    This case is not appropriate for a determination under Rule 12(b)(6) that there can be no liability to Plaintiff under any of the Claims.  To dismiss any of the

---

[11] The Plaintiff also contends that on this theory, his Claim for civil conspiracy would support the punitive damages Claim.  However, the evidentiary showing of aggravating factors required to support Plaintiff's punitive damages Claim would be the same whether the underlying supportive Claim arises from breach of contract, breach of fiduciary or civil conspiracy.  Consequently, determination of this contention is not necessary to resolving the Defendants' Motion, and the court does not rule at this time on the issue of whether the civil conspiracy Claim will support the punitive damages Claim.
[12] Compl., ¶ 110.

Claims at this point would be to "go too fast too soon." *Sutton v. Duke*, 277 N.C. at 108. By utilizing discovery, Defendants may be able to ascertain "more precisely the details of [P]laintiff's [C]laim[s] and whether he can prove facts which will entitle him to have a jury decide the merits of his [C]laim[s]." *Id.* If there then exists a good faith contention that Plaintiff cannot prove sufficient facts as to any such Claim, Defendants may utilize the pre-trial procedures of Rule 56, or other suitable procedural device.

VI.

ORDER

[59]    NOW THEREFORE, based upon the foregoing CONCLUSIONS, it is ORDERED that Defendants' Motion to Dismiss Plaintiff's Second, Third, Fourth and Fifth Claims is DENIED.

[60]    The parties shall confer and submit a Case Management Report with regard to this matter, pursuant to Rule 17 of the Business Court Rules, on or before September 18, 2009.

[61]    The court will hold a Case Management Conference at 11:00 a.m. on September 29, 2009, at the North Carolina Business Court, 227 Fayetteville Street, Raleigh, North Carolina 27601.

[62]    In addition to appropriate counsel of record, the individual parties are directed to attend the Case Management Conference in person.

This the 21st day of August, 2009.